# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
### Case No. 12-21780-CIV-SEITZ

BUD PRATT WILLIAMS,

      Petitioner,

v.

UNITED STATES OF AMERICA,

      Respondent.

_____/

## ORDER DENYING PETITION

      Petitioner Bud Pratt Williams was convicted of possession with intent to distribute MDMA, conspiracy to possess with intent to distribute MDMA, and attempt to possess with intent to distribute MDMA. Williams brings 28 claims for relief, mostly couched in terms of ineffective assistance of counsel but also alleging misconduct by the prosecution, the trial court, the court reporter, and a juror. The Court has conducted a *de novo* review of Williams's petition [DE-1; DE-4; DE-5; DE-10], the briefing [DE-16; DE-22], the Report of Magistrate Judge Following Evidentiary Hearing (the "Magistrate's Report") [DE-48], the evidentiary hearing transcript [DE-77], Williams's objections to the Magistrate's Report [DE-51], and the record in Williams's criminal case.[1] For the reasons below, Williams's objections to the Magistrate's Report are overruled and his petition is denied.

---

[1]       While Williams also filed numerous papers after he filed his objections, they will not be considered because Williams had an obligation to present all of his arguments in his petition. *See Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987) (petitioners "must take before the magistrate, not only their 'best shot' but all of their shots").

## A. Background

### 1. Offense Conduct

As part of a law enforcement investigation into drug dealing in Florida City, a confidential informant (the "CI") bought one MDMA pill from Williams's co-defendant, Nehgui Cox, on February 26, 2009. On March 11, the CI bought 500 pills. The goal was to draw out Cox's supplier by making larger orders each time.

On March 19, 2009, the CI called Cox to buy 1,000 pills, and they agreed to meet in Florida City. Cox then immediately called Williams, and over the next two hours, numerous phone calls took place between Cox and Williams, between Williams and Morris Henderson, and between Cox and the CI. In one of those calls, Cox told the CI he needed to pick up the pills near 125th Street before making the sale, so they agreed to change the location to a Walgreens parking lot on 119th Street.

Around 3:30 pm, a Pontiac Grand Prix arrived in the Walgreens parking lot. Cox exited from the passenger side, walked to the street corner, and called someone on his cell phone. A few minutes later, Williams arrived in a Nissan Altima, picked up Cox, drove him around the block, entered the Walgreens parking lot, and parked. Cox got out, sold 1,000 MDMA pills to the CI, and returned to the Altima. Williams drove Cox to a nearby gas station and then back to the Walgreens. Cox left in the Pontiac, and Williams drove the Altima to Morris Henderson's residence.

On April 6, 2009, the CI contacted Cox to buy 4,000 pills. They planned to meet two days later at the Walgreens. On April 8, there was a similar pattern of cellular phone calls: Cox spoke with the CI, then with Williams, then with the CI again; Williams spoke with Henderson and then with Cox again; and so forth. In one of these calls, Cox told the CI that the pills were "up north" and changed the buy location to a Sam's Club in Sunrise.

Around 4:30 pm, a white Ford Expedition arrived at the Sam's Club parking lot. Morris Henderson was driving, Williams was in the front passenger seat, and Cox and Tedrick Cunningham were in the back. Cox got out of the Expedition and entered a car with the CI and an undercover officer. Cox told them to follow the Expedition, but they refused to leave the parking lot. When the Expedition started to leave, the police stopped it and arrested Cox, Williams, Henderson, and Cunningham. They found one loaded revolver in the Expedition's center console and narcotics cutting agent (also known as "cut") in the rear, but no MDMA.

## 2. Pre-Trial Events

After the arrest, everyone was first taken to the High Intensity Drug Trafficking Area Task Force office. Williams and Cox were transferred to the Miami Federal Detention Center and then indicted on April 21, 2009. [Cr-DE-17.][2]

Reginald Anthony Moss, Jr. ("Attorney Moss") was Williams's first attorney. He was replaced on May 1 by Allen Stewart Kaufman, who was replaced on May 31 by Clement Dean ("Attorney Dean").

On June 5, 2009, DEA Special Agents Kevin Bobbitt and Ronald Martin interviewed Donavan Jonas, an FDC inmate who claimed that he had learned details of the MDMA conspiracy from Williams and Cox and hoped his cooperation with law enforcement might prevent his deportation to Jamaica. Jonas provided detailed descriptions of the March 19, 2009 and April 8, 2009 drug transactions as well as other information about Williams's behavior at FDC. [DE-4 at 10–14.]

Cox pled guilty on June 23. [Cr-DE-61.] Williams's trial began on June 29.

---

[2]     Docket entries in this case will be cited as "[DE-X]", and entries in Williams's criminal case (No. 09-cr-20345) will be cited as "[Cr-DE-XX]."

### 3. Trial and Post-Trial

At trial, the prosecution established the sequence of events through direct testimony, surveillance videos, recorded calls, and cellular phone records. It argued that the sequence of events only made sense if Williams was Cox's supplier and Henderson was Williams's supplier. Jonas testified that Williams had confessed to him and recounted the details of the drug transactions that he had learned from Williams. Finally, Agent Bobbitt described Jonas's role in the investigation and explained that he had found Jonas reliable because Jonas knew details about the drug transactions that were not public knowledge. Agent Bobbitt further testified that Jonas had pointed law enforcement to previously unknown evidence, including Bahamian phone numbers and text messages on Williams's cellular phone and the fact that Williams had used another inmate's phone account while at FDC.

Williams testified in his own defense. He denied being involved in the two drug transactions or knowing that any drug transactions were about to take place. He testified that he met with Cox on March 19 because Cox owed him money for a watch, and that he never saw Cox with MDMA or otherwise knew that Cox was selling MDMA. [Cr-DE-162 at 14–19.] He further testified that on April 8, he took Cox to the Sam's Club because Cox's vehicle was "messed up" and Cox needed to be dropped off so he could take a boat ride to the Bahamas. He testified that he did not know about the cut or the gun recovered from the Expedition until after the arrest. [*Id.* at 20–25.] The jury found Williams guilty on July 8, 2009.

Richard Docobo represented Williams for sentencing. [Cr-DE-102.] Williams was sentenced to 235 months in prison. [Cr-DE-156.] William Norris represented Williams on appeal. [Cr-DE-169.] Williams raised four issues on appeal: (1) the admission into evidence of "cut," the firearm, and recorded jailhouse phone calls, (2) the sufficiency of

- 4 -

the evidence, (3) whether the prosecution had improperly vouched for Jonas's credibility, and (4) the denial of Williams's post-trial motion for a new trial. The Eleventh Circuit affirmed Williams's conviction, noting that there was "ample evidence of Williams's guilt besides Jonas's testimony." *U.S. v. Williams*, 410 F. App'x 272, 274 (11th Cir. 2011).

## B. DISCUSSION

The legal framework on collateral review asks whether a constitutional error took place that caused "'actual prejudice,' meaning that the error had a 'substantial and injurious effect or influence' on the jury's verdict." *Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301, 1307 (11th Cir. 2012) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). [*See* DE-48 at 15–20.] The Court has applied this framework to Williams's 28 claims, which allege misconduct by nearly every major participant in the trial. Because many of these 28 claims overlap, to facilitate the analysis, they are grouped into 17 groups based on the factual allegations underpinning each claim. The ineffective-assistance claims alone run the gamut from failing to advise him correctly about pleading to failing to make very specific evidentiary arguments. But the thrust of Williams's petition is that (1) the government, embarrassed by a botched drug sting, fabricated a case against him by suborning perjury from law enforcement officers, feeding information to Jonas so he could concoct a story of Williams having confessed, and intimidating Williams's co-defendant out of testifying in his defense and (2) his attorneys simply let this happen.

### 1. Claim 28: Ineffective Assistance Relating to Advice About Pleading Guilty

In claim 28, Williams argues that Attorney Dean provided ineffective assistance by misadvising him of the relative benefits of pleading guilty versus going to trial. He alleges that Attorney Dean told him not to take a 16-year plea deal because the

government had no case without Jonas, and that Jonas could not testify unless the government could prove beyond a reasonable doubt that he knew Williams.

Magistrate Judge Patrick A. White held an evidentiary hearing on this claim. Williams testified that Attorney Dean had told him that the government had offered a plea deal that would result in a 15–16-year sentence and that he should not take it. [DE-77 at 6–18.] Attorney Dean could not recall receiving any plea offer or discussing with Williams any plea that would involve cooperating against Henderson. He also testified that he quoted Williams $40,000 to take the case to trial, and that he would have charged less if he had been retained to negotiate a plea. [*Id*. at 18–42.] The government further represented that it never offered Williams a plea deal. [*Id*. at 47.]

Based on the evidentiary hearing, Judge White found that Williams had retained Attorney Dean specifically for trial, that no plea deal was ever offered, and that Williams would not have taken a plea deal even if it were available. He therefore recommended dismissing this claim. [DE-48 at 20–36.] Having reviewed the record, the Court finds that Judge White's factual findings are not clearly erroneous and are amply supported by the record.

The Court will overrule Williams's objections as to this claim for two reasons. First, there is no evidence that the government ever extended a written plea offer.[3] The prosecutor stated at the evidentiary hearing that she always sends plea offers in writing, and that she had reviewed her files and found one for Cox, his co-defendant, but nothing for Williams. [*See* DE-77 at 47.] Williams has neither provided a written copy of a plea offer nor suggested what the terms of any offer might have been.

---

[3]     Plea agreements in federal court are almost always in writing. *See* Dep't of Justice, United States Attorneys' Manual 9-27.450 (1997), available at http://www.justice.gov/usam/usam-9-27000-principles-federal-prosecution.

Williams argues that the prosecutor could not have sent Cox a plea offer because Cox pled straight to the indictment. [*See* Cr-DE-113 at 2.] But there is no inconsistency here. The prosecutor did not say that Cox *accepted* a plea offer. The record shows that the government wanted Cox to name his supplier, but he refused and pled straight to the indictment. [*See* Cr-DE-113 at 27.]

Second, Williams would not have admitted guilt. Before a federal court can accept a guilty plea—whether it is straight to the indictment or pursuant to a plea agreement—it "must determine that there is a factual basis for the plea." Fed. R. Crim. P. 11(b)(3).[4] And Williams has consistently maintained his innocence. The Court would not have accepted a plea "for convenience." [DE-77 at 12.]

Because the preponderance of the evidence established that neither Williams nor the government were interested in a plea deal, the Court agrees with Judge White's conclusion that Williams could not have been prejudiced by any failure of Attorney Dean to pursue plea negotiations. Therefore the Court will adopt Judge White's factual findings and legal conclusions on these points and dismiss claim 28.

## 2. Claims 1 and 3: Cellular Phone Warrant

A Samsung cellular phone seized from Williams during arrest contained an incriminating text message as well as records of calls with a Bahamian phone number. [*See* Cr-DE-172 at 167.] At trial, Agent Bobbitt testified that he had not searched the phone until after Jonas told him that Williams was worried that law enforcement might find incriminating evidence on them. [Cr-DE-172 at 166–68.] Williams alleges that this was a lie. According to Williams, Agent Bobbitt must have searched the phone earlier because he filed a report on May 1, 2009 [DE-4 at 4–5] listing the phone as having the

---

[4]     Williams's lack of familiarity with federal criminal procedure may be due to the fact that his prior criminal history was entirely in the state court system.

number (242) 466-2590—the same Bahamian phone number that he supposedly only learned about from Jonas.[5] But Agent Bobbitt did not speak to Jonas until June 5, and the search warrant was issued on June 18.

Williams has two claims based on these allegations. In **claim 3**, he argues that the search warrant was invalid because it was procured by a false statement. In **claim 1**, he argues that Attorney Dean was ineffective because he failed to (1) investigate the pre-warrant search of his phones, (2) move for a mistrial after Agent Bobbitt testified that there was no pre-warrant search, and (3) call Cuzo, the owner of the (242) 466-2590 number, to testify about the text message.

These claims fail. As to claim 3, affidavits supporting search warrants are presumptively valid and may only be challenged if a defendant makes a "substantial preliminary showing" that (1) a law enforcement officer intentionally or recklessly included a false statement in the affidavit and (2) the false statement was necessary to the finding of probable cause. *Franks v. Delaware*, 438 U.S. 154, 155–56, 171–72 (1978). Probable cause for a search warrant requires only "a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009) (citation omitted).

Putting aside Williams's burden as to *Franks*'s first requirement, he cannot meet the second requirement because the warrant affidavit had ample evidence of probable cause, even without the alleged false statement.[6] It described Williams's presence and behavior at both drug transactions and Cox's post-arrest statements to law enforcement describing Williams as his supplier. It recounted phone calls on April 8 in which Cox told the CI he needed to call his supplier before he could confirm the time and place.

---

[5]     The Samsung's number was (786) 985-8121, as noted on the warrant. [DE-4 at 8.]

[6]     The warrant was issued on June 18, 2009 in Case No. 09-2837-JJO. The affidavit was authored by Special Agent Tonya R. Cook, a member of Agent Bobbitt's team.

The calls suggest that Cox and Williams arranged drug deals over the phone and establish probable cause to search Williams's phone for evidence of those deals. Although the affidavit also cited Jonas's statement that Williams was worried about incriminating evidence on his phones, this statement was not necessary to establish probable cause.

As to claim 1, Williams cannot show that Attorney Dean's performance in this area was deficient. Williams argues that he should have moved for a mistrial on the basis of witness perjury. But the error in Agent Bobbitt's May 1, 2009 report does not show that Agent Bobbitt illegally searched Williams's phone and then lied about it. In fact, it is easily reconciled with his testimony at trial, namely that after the arrest, he opened each phone so he could find and record the phone number associated with each. [Cr-DE-172 at 114–16.] Agent Bobbitt's error simply suggests that he was trying to find the number associated with the phone but instead mistakenly wrote the phone number from a recent call. This is nowhere near sufficient to move for a mistrial on the basis of witness perjury. *See United States v. Dunnigan*, 507 U.S. 87, 94 (1993) (perjury is the giving of "false testimony concerning a material matter *with the willful intent to provide false testimony*, rather than as a result of confusion, mistake, or faulty memory" (emphasis added)).

Even as impeachment evidence, the error in Agent Bobbitt's May 1, 2009 report is fairly weak. Attorney Dean reasonably could have concluded that questioning Agent Bobbitt about it would strain the jury's patience more than it would undermine Agent Bobbitt's credibility. Similarly, he reasonably could have concluded that it was not worth seeking a *Franks* hearing on the basis of such little evidence.  *See Anderson v. United States*, 762 F.3d 787, 793 (8th Cir. 2014) (counsel was not deficient for failing to seek a *Franks* hearing because he "reasonably could have concluded" that the

defendant's proffered evidence simply "set up a swearing contest," which "would fail to meet the *Franks* threshold"), *cert. denied*, 135 S. Ct. 1017 (2015).

Moreover, an attorney's approach will not be second-guessed as long as it "might be considered sound trial strategy." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). Competent attorneys have to "balance limited resources in accord with effective trial tactics and strategies." *Harrington v. Richter*, 562 U.S. 86, 107 (2011). Attorney Dean's strategy was to argue that the government rushed to judgment against Williams and that Jonas took advantage of this by learning details of the transactions from wherever he could and then using that information to concoct a story of Williams's confession. This was a reasonable strategy—accusing everyone of lying is rarely effective, and it is usually easier to discredit a jailhouse informant than a police officer. Trying to impeach Agent Bobbitt's honesty with an error that could be easily explained would have been inconsistent with this strategy, and it would have done nothing for the more important goal of undermining Jonas's credibility.

Similarly, Williams has provided no affidavit particularizing what Cuzo would have said. Therefore, he cannot establish that Attorney Dean should have called Cuzo or that he was prejudiced by Attorney Dean's failure to do so.

### 3. Claims 2 and 9: FDC Inmates' Potential Testimony about Jonas

In **claim 2**, Williams argues that Attorney Dean was ineffective at trial because he failed to present three FDC inmates as witnesses. According to Williams, they would have testified that Jonas did not know Williams but had been sexually involved with Cox. In **claim 9**, Williams argues that his sentencing counsel was ineffective after trial because he failed to present two other FDC inmates as witnesses at sentencing. According to Williams, they would have testified that Jonas had confessed to them that he had fabricated Williams's confession.

Both of these claims fail. As Judge White noted [DE-48 at 62–64], Claim 9 is a reiteration of Williams's October 16, 2009 *pro se* motion for a new trial. [*See* Cr-DE-119.] That motion was denied. [Cr-DE-125.] The denial was affirmed on appeal. *Williams*, 410 F. App'x at 276. Because the argument in claim 9 has already been rejected on direct review, "it cannot be relitigated in a collateral attack." *United States v. Nyhuis*, 211 F.3d 1340, 1343 (11th Cir. 2000) (citation omitted). Williams's objections do not challenge Judge White's reasoning, but rather speculate that Jonas might still be in the country. [DE-51 at 29–30.] Accordingly, Williams's objections as to claim 9 are overruled.

Turning to claim 2, to establish ineffective assistance of counsel, Williams must show that his counsel's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 688. This requires proving both that (1) counsel's performance was deficient and (2) the defendant was prejudiced by the deficient performance. *Id*.

Claim 2 fails because Williams cannot show that he was prejudiced by Attorney Dean's failure to call these witnesses at trial. As Judge White noted, Williams did not even provide affidavits particularizing what these witnesses might say. [DE-48 at 48–50.] Williams's objections do not challenge Judge White's reasoning. Instead, they make other arguments to support Williams's claim that he did not know Jonas. [DE-51 at 7–11.] Accordingly, Williams's objections as to claim 2 are overruled.

### 4. Claims 4 and 5: Suspension of Williams's Phone Privileges

On June 12, 2009, FDC learned that Williams had been making phone calls using another inmate's phone account. On June 16, it formally suspended his phone privileges for 180 days. [DE-4 at 21–23.] At trial, Agent Bobbitt testified that he first learned about Williams's use of another inmate's phone account when Jonas told him about it. [Cr-DE-161 at 85–86.] Williams argues that it was impossible for Jonas to have told Agent

- 11 -

Bobbitt about this on June 5, when Agent Bobbitt first met with Jonas. [*See* DE-4 at 10–14.] Moreover, Jonas testified that he and Williams were both housed in Unit 9-West, but according to Williams, the Incident Report from the violation [DE-4 at 21] proves that Williams was not housed in Unit 9-west on June 12. Therefore, Jonas could not have known about the suspension of his phone privileges, and Agent Bobbitt could not have learned about it from Jonas.

Based on these allegations, Williams argues in **claim 5** that the prosecution suborned perjury by having Agent Bobbitt testify that he learned about Williams's phone suspension from Jonas. He argues in **claim 4** that Attorney Dean was ineffective because he stipulated that Williams's phone privileges were taken away before June 5, which made it impossible to argue that there was no way for Jonas to have known that Williams's phone privileges were suspended.

These claims fail. As to claim 5, Agent Bobbitt did not speak with Jonas only once. Rather, he testified that he interviewed Jonas three times, the *first* of which was on June 5. [Cr-DE-173 at 43; Cr-DE-172 at 134.] He could not remember exactly when Jonas told him about Williams's use of another inmate's phone account. [Cr-DE-173 at 63–64.] None of this is inconsistent with the Incident Report.

As to claim 4, Williams cannot show that Attorney Dean's performance in this area was deficient. Attorney Dean's strategy was to show that Jonas could have learned all of his information from sources other than Williams and that Agent Bobbitt did not try to verify Jonas's story except to make sure that it matched what he wanted to hear. This was a reasonable strategy, and in fact Attorney Dean did get Agent Bobbitt to admit that he did nothing to investigate whether Jonas and Williams were housed in the same unit at FDC. [Cr-DE-173 at 45–46.]

The stipulation was entirely consistent with this strategy. On direct examination, Agent Bobbitt had testified that he first learned about Williams's use of another inmate's

phone account from Jonas. [Cr-DE-161 at 85–86.] So Attorney Dean tried to establish that Jonas only told Agent Bobbitt about Williams's use of another inmate's phone account *after* FDC had already suspended Williams's phone privileges. [Cr-DE-173 at 63–64.] The implication was that Jonas only learned about it after it was already widely known at FDC. The government offered to stipulate that Williams's phone privileges had already been suspended by the time Agent Bobbitt met with Jonas, so Attorney Dean agreed. [*Id.* at 65.]

### 5. Claims 19 and 20: Surveillance Evidence

At trial, Agent Bobbitt testified that Jonas had told him that there was a surveillance team on April 8 at Henderson's residence. He further testified that Jonas was correct and there really was a surveillance team there on that day. In **claim 20**, Williams argues that the government thereby improperly vouched for a witness's credibility on the basis of evidence not before the jury. He insists that the members of the surveillance team should have testified directly. [DE-51 at 67–69.] This claim fails. At best, this is a belated, meritless evidentiary objection about an unimportant matter. Any arguments about the government improperly vouching for Jonas have already been rejected on direct review.

In **claim 19**, Williams argues that Attorney Dean was ineffective for failing to object to law enforcement's testimony that, on April 8, the Expedition dropped off Cox in the Sam's Club parking lot near the undercover vehicle. Williams alleges that the Expedition actually dropped him off outside the parking lot—significantly further away. He argues that the error suggested to the jury that Williams intended for Cox to enter the undercover vehicle. He also suggests that law enforcement could not have seen Cox exit the Expedition and so could not have had probable cause to stop the

Expedition. He insists that the surveillance video from the Sam's Club would confirm this.

However, the surveillance video was entered into evidence as Exhibit 34, enabling the jury to decide whether it was consistent with the testimonial evidence. Williams's argument that the prosecution moved it into evidence "but never presented it to the jury" [DE-5 at 31] misunderstands what it means for something to be admitted into evidence. Thus there was no prejudice from Attorney Dean's asserted failure to present it to the jury, and this claim fails.

### 6. Claim 8: Ineffective Assistance Relating to the Cox Affidavit

**Claim 8** relates primarily to Cox's April 13, 2009 affidavit stating that Williams had no knowledge of any MDMA and that Cox would testify to that effect. Before trial, Williams moved to sever his trial from Cox's so that Cox could testify at Williams's trial. [Cr-DE-51.] He attached Cox's affidavit to the motion. [Cr-DE-51-1.] However, at the pretrial conference, the government stated that it had (1) a recording of a jailhouse phone call in which Williams indicated that he'd promised to pay Cox $15,000 for a false exculpatory affidavit and (2) a witness who would testify that he saw Williams and Attorney Moss pressure Cox into signing it. The government explained that if Cox testified consistently with his affidavit, the government intended to impeach him with the recording and with Cox's own post-*Miranda* statements to law enforcement describing Williams as his supplier. [Cr-DE-154 at 53–55, 79–82.] Cox's attorney told the Court that he did not want Cox to testify at Williams's trial. [*Id.* at 78.] Attorney Dean argued that the government's arguments amounted to witness intimidation, but his objection was overruled. [*Id.* at 88–98.]

Williams maintains that Attorney Dean was ineffective because he failed to challenge the government's assertion that Williams paid or pressured Cox into writing

a false affidavit. He insists that the recorded phone call was really about a $15,000 fee arrangement with Attorney Dean and that Cox would have testified on his behalf if the government hadn't falsely portrayed the call as suggesting that Cox had engaged in obstruction of justice. Williams further alleges that Attorney Dean failed to correct the government's portrayal because the fee arrangement created a conflict of interest, and that Attorney Dean admitted to the conflict during a post-trial hearing before Judge O'Sullivan.

This claim fails. Because Cox never testified, the jury never heard about Cox's affidavit or the alleged $15,000 payment. [*See* Cr-DE-160 at 192–196.] The affidavit's primary significance comes from its role in Attorney Dean's decision not to call Cox as a witness.[7] And in that area, Attorney Dean's performance was not deficient. Before trial, Attorney Dean tried to have Cox testify, moving to sever the trial and even accusing the government of witness intimidation. But after the pretrial conference, Attorney Dean had no good options left. Cox's affidavit itself was hearsay and could only be admissible if Cox testified. Cox's attorney was advising him not to testify. But even if Cox testified consistently with his affidavit, he would have been testifying as a convicted felon, and the government would have impeached him with the recorded phone call[8] and his post-*Miranda* statement describing Williams as his supplier. [*See* Cr-DE-154 at 53–55, 79–82.] At best, this would set up a swearing contest between Cox and

---

[7]     It also played a role in Williams's two-point sentencing enhancement for obstruction of justice. [Cr-DE-156 at 40–41.]

[8]     The recorded phone call has been filed in the docket. [DE-79.] In that call, Williams talks about his lawyers, describes the importance of a written exculpatory statement, and says he needs to pay $15,000. However, he does not name the recipient of the $15,000. While the call could be interpreted as referencing a $15,000 fee arrangement with Attorney Dean, it could also be interpreted as referencing a $15,000 payment to a "Buddy" who was willing to help "toss" Williams's case, such as Cox.

Agent Bobbitt, while allowing the government to introduce incriminating evidence that would not otherwise have been admissible. It was entirely reasonable for Attorney Dean not to pursue this further after the pretrial conference. *See Anderson v. United States*, 762 F.3d 787, 793 (8th Cir. 2014) (counsel reasonably could have decided not to present evidence that might simply "set up a swearing contest"), *cert. denied*, 135 S. Ct. 1017 (2015).

Insofar as this claim asserts that Attorney Dean has a conflict of interest, the claim is meritless for the reasons stated by Judge White. [DE-48 at 57–62.]

### 7. Claims Relating to Cox's Statement to Williams During Arrest

### a. Claim 17: Alleged Perjury by Agent Bobbitt

Agent Bobbitt testified that, while he was walking Cox to a police car during the arrest, he heard Cox tell Williams that the CI and undercover officers had "set us up." [Cr-DE-173 at 28.] However, he also testified that he was not part of the take-down team that carried out the arrest. He said that he was observing from a few yards away and monitoring audio from the undercover officer and that he arrived in the parking area immediately after the arrest. [Cr-DE-173 at 40–42.]

**In claim 17**, Williams argues that Agent Bobbitt thereby admitted that it was the take-down team, not Agent Bobbitt, who put Cox in the car, and that this proves that Agent Bobbitt perjured himself in order to admit Cox's statement. This claim fails. "Mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony." *Shasteen v. Saver*, 252 F.3d 929, 933 (7th Cir. 2001). Moreover, Williams could not have been prejudiced by an inconsistency that was fully explored on cross-examination. *See United States v. Saadeh*, 61 F.3d 510, 523 (7th Cir. 1995) (no prejudice because defendant had "ample opportunity, of which he

took advantage, to cross-examine [the witness] during the trial, discredit him, and expose any alleged perjury").

### b. Claims 14, 15, 16: Ineffective Assistance

In these claims, Williams argues that his attorneys were ineffective in how they challenged Agent Bobbitt's testimony about Cox's statement to Williams. He alleges that a recording of the conversation between Cox and Williams in the police car after the arrest, which was excluded as evidence [Cr-DE-173 at 59], would have demonstrated that he had no idea that Cox was selling drugs. In **claim 14**, he argues that Attorney Dean was ineffective because his attempt to admit the recording into evidence was unsuccessful. In **claim 15**, he argues that his appellate counsel was ineffective because he failed to appeal the trial court's exclusion of the recording. In **claim 16**, he argues that Attorney Dean was ineffective because he failed to call Cox as a witness to clarify his statement.

These claims also fail. First, there was no basis for an evidentiary objection to Agent Bobbitt's testimony because as Judge White explained, Cox's statement was properly admitted as an excited utterance. [DE-48 at 67–69.] Second, Attorney Dean's performance was reasonable as to the police-car recording. He initially objected to its admission because it contained references to "cut." [Cr-DE-171 at 20; *see also* Cr-DE-160 at 126.] He even raised Williams's concern about inaccuracies in the transcript. [Cr-DE-160 at 162.] But after other evidence of the cut had come in [*see* Cr-DE-160 at 143–44], Attorney Dean tried to have the recording admitted, arguing that it was relevant to Williams's state of mind. [Cr-DE-173 at 57–59.] The Court rejected that effort on grounds that the recording was self-serving hearsay. [Cr-DE-173 at 59.] Third, as discussed above regarding claim 8, Attorney Dean made a proper strategic decision not to call Cox as a witness. Fourth, Williams cannot show that appealing the exclusion of

the recording in the patrol car would have been successful. Given all of the other evidence against Williams, the exclusion was at worst a harmless error. Therefore, Williams was not prejudiced by his appellate counsel's failure to appeal the ruling.

### 8. Claims 13 and 27: Phone Calls Between Cox and the CI

These claims relate to recordings of the phone calls in which Cox and the CI arranged the two drug transactions. In **claim 13,** Williams argues that Attorney Dean was ineffective because he failed to challenge the calls' authenticity or argue that they were illegal wiretaps. This claim fails because the CI was "a person acting under color of law," and the Wiretap Act allows "a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication." 18 U.S.C. § 2511(c). Therefore, no warrant was needed for the CI to record his own conversations with Cox. Nor was there a basis to challenge the recordings' authenticity because, as Judge White explained, Agent Bobbitt testified that he recognized both voices, which is sufficient under Fed. R. Evid. 901. [DE-48 at 65–66.] Williams objects that the jury could not make its own decision as to the recorded voices because neither Cox nor the CI testified. But he points to nothing about the recordings that would plausibly suggest that they were actually inauthentic. There was therefore no reason for Attorney Dean to make an issue out of this.

In **claim 27**, Williams argues that admission of the recorded phone calls and other hearsay statements from Cox violated the Confrontation Clause because neither Cox nor the CI testified at trial. This claim is meritless. As Judge White explained, "statements in furtherance of a conspiracy" are not testimonial and do not implicate the Confrontation Clause. *Crawford v. Washington*, 541 U.S. 36, 56 (2004). [DE-48 at 78–81.]

### 9. Claim 24: Ineffective Assistance Relating to Cunningham

After the April 8 arrest, Cunningham was placed in a holding cell next to the CI. Cunningham told the CI about the drug transaction, which the CI recorded. On May 28, Williams called Cunningham, said that someone had been wearing a wire, told him to keep quiet, said "once you get that label . . . you can't eat no more," and said "you are flauging so much you don't even know what you are saying." [Cr-DE-173 at 12.] The prosecution played the May 28 call at trial and argued that Williams was telling Cunningham not to snitch to law enforcement.

This triggers Williams's argument in **claim 24** that Attorney Dean was ineffective for failing to investigate whether Cunningham was mentally ill. He argues that Cunningham had no idea what he was saying and just made up things to impress the CI, and that Attorney Dean should have looked into this because the government tried to establish at trial that Cunningham was a competent, unindicted co-conspirator.

Magistrate Judge White recommended dismissing this claim because Williams had not established Cunningham's disability and because Williams could have testified about Cunningham's alleged incompetence but chose not to. [DE-48 at 71–75.] In his objections, Williams insists that Cunningham is mentally disabled and that the government used Cunningham's confession against him. [DE-51 at 77–80.]

This claim fails because Attorney Dean's performance in this area was clearly not deficient. He effectively challenged the prosecution's interpretation of the recorded call and suggested more favorable interpretations of Williams's statements on that call. Williams provides no reason why evidence of Cunningham's alleged mental illness would have been useful.

### 10. Claims 6, 7 and 12: The Gun

In the post-arrest search of the Expedition, law enforcement found a gun in the center console. At trial, Jonas testified that Williams told him that Henderson had put the gun in the center console. [Cr-DE-161 at 19–20.] Agent Bobbitt testified that he'd confirmed with the Bureau of Alcohol, Tobacco, Firearms and Explosives that the gun was registered to Henderson. [Cr-DE-173 at 60–62]. The implication was that Jonas was reliable because he knew information about the gun that was later corroborated. However, the gun registration itself was never entered into evidence.

Williams argues in **claim 7** that the prosecution thereby improperly vouched for a witness on the basis of evidence that was not before the jury. In **claim 6**, he argues that his trial counsel was ineffective in failing to subpoena the gun registration or otherwise challenge the claim that the gun was registered to Henderson. In **claim 12**, he argues that his appellate counsel was ineffective for failing to raise this issue. [DE-1 at 12–15; DE-5 at 18.]

These claims lack merit. Claim 7 fails because arguments about improperly vouching for Jonas have already been rejected on direct review. *Williams*, 410 F. App'x at 275. Claims 6 and 12 fail because neither Attorney Dean nor his appellate counsel performed deficiently. Competent attorneys are expected to prioritize and do not need to chase every minor lead at trial or raise every conceivable argument on appeal. The crucial question about the gun was not to whom it was registered, but whether Williams knew about it. Attorney Dean appropriately focused on that crucial question, successfully eliciting testimony that due to the design of the Expedition's center console, even the owner of the Expedition might not know that there was a gun inside. [Cr-DE-172 at 161–62.] Similarly, his appellate counsel was reasonable in deciding not to raise a belated evidentiary objection about an unimportant matter.

### 11. Claim 18: Agent Bobbitt's Other Alleged Perjury

At trial, Agent Bobbitt testified that he had listened to every call that Williams made from FDC and that four or five contained conversations about Cunningham ripping off Williams by taking $1,900 worth of "clothes" but only giving $700 back. The prosecution played one such call, and Agent Bobbitt agreed that the female on the call told Williams that "Little Git" (a nickname for Cunningham) had stolen $1,900 of clothes from the cabinet while her back was turned, to which Williams responded that she should look in a cigarette box for the "clothes." Agent Bobbitt testified that "clothes" was a code word for drugs and that the conversations made no sense otherwise. [Cr-DE-162 at 86–87.] However, on cross-examination a few minutes later, Agent Bobbitt said he never testified that Williams said on the call that Little Git had stolen $1,900 of clothes from the cabinet. [*Id*. at 88–89.]

While Williams argues in **claim 18** that this was perjury, it was not. It was routine impeachment of a witness. Nothing about this exchange suggests that Agent Bobbitt had a willful intent to provide false testimony. The jury saw and heard everything and was fully able to decide its effect on their assessment of Agent Bobbitt's credibility.

### 12. Claim 25: Testimony about Cellular Phone Records

In **claim 25**, Williams argues that Attorney Dean was ineffective for failing to object to Robert Christie being called as an expert witness to testify about the cellular phone records. Judge White recommended dismissing this claim because Christie was not called as an expert witness. [DE-48 at 75–78.] Williams objects that Christie must have been an expert witness because the government "notic[ed] him as an expert in an abundance of caution" in a pretrial discovery response. [DE-22 at 56.] This objection

- 21 -

ignores the fact that he actually testified at trial as a lay witness. [Cr-DE-160 at 32.]
Therefore, Williams's objections on this point are overruled.

### 13. Claim 22: Jury Instructions

In **claim 22**, Williams argues that the jury instructions were improper because (1)
they included an instruction for constructive possession even though the indictment did
not charge him with constructive possession and (2) they instructed the jury that the
government did not need to prove that the defendant had knowledge of the particular
drugs involved. Magistrate White recommended dismissing this claim because the
Eleventh Circuit had squarely rejected both of Williams's arguments. *See United States v.
Leonard*, 138 F.3d 906, 909 (11th Cir. 1998) ("The government may satisfy the
'possession' prong by showing either actual or constructive possession."); *United States
v. Gomez*, 905 F.2d 1513, 1514 (11th Cir. 1990) ("To sustain a conviction for possession
with intent to distribute a controlled substance, it need not be proved that the defendant
had knowledge of the particular drug involved, as long as he knew he was dealing with
a controlled substance.").

Williams objections seem to make two arguments. First, he argues that he was
convicted of an unnamed crime that was not charged in the indictment and that had
"constructive possession" as an element. This is not true. He was convicted of
possession with intent to distribute a controlled substance, conspiracy to possess with
intent to distribute a controlled substance, and attempt to possess with intent to
distribute a controlled substance, all of which were charged in the indictment.
"Constructive possession" is one way to prove possession.

Second, Williams argues that he could not have known the goal of the conspiracy
without knowing the type of drug that the conspiracy involved. Again, the Eleventh

Circuit has squarely rejected this argument. *See United States v. Sanders*, 668 F.3d 1298, 1311 (11th Cir. 2012). Therefore, Williams's objections as to this claim are overruled.

### 14. Claim 10: Sentencing

In **claim 10**, Williams argues that his sentencing counsel was ineffective because he failed (1) to move for a continuance on the basis of a revision made to the Presentence Investigation Report ("PSI")[9] one day before the sentencing hearing or (2) to challenge Williams's career-offender enhancement. [*See* DE-10.]

As for the continuance, Magistrate Judge White recommended dismissing this claim because Williams was not prejudiced by the failure to request a continuance. Williams and his sentencing counsel had ample opportunity to review the revisions because the probation officer reviewed every change in detail during the sentencing hearing. Williams personally told the Court that he had finished reviewing it and had no questions. [Cr-DE-156 at 24.] Moreover, there was ample evidence at trial to support holding Williams responsible for the 4,000 pills, so a continuance would have served no purpose. [DE-48 at 81–86.]

Williams objects that, with a continuance, his sentencing counsel could have investigated whether Williams was a career offender and whether the pills had in fact tested positive for MDMA. The Court will overrule Williams's objections on these points. Counsel did argue at sentencing that the 4,000 pills might not have been MDMA. However, he was unsuccessful because the evidence at trial showed that Williams believed them to be MDMA, which is sufficient for an attempt charge. [Cr-DE-156 at 25–26.] Therefore, counsel's performance was not deficient.

---

[9]      The original PSI held Williams responsible for 171.66 grams of BZP, 446.86 grams of MDMA, and 12.5 grams of marijuana. [*See* Cr-DE-131.] As revised, it held him responsible for 1,296.29 grams of MDMA, which reflects the 4,000 pills from the April 8, 2009 transaction. (PSI ¶ 26.)

As for the career-offender enhancement, Williams is correct that he was not a career offender. *See United States v. Shannon*, 631 F.3d 1187 (11th Cir. 2011). But his claim still fails because he was not prejudiced by the enhancement. The only effect of the enhancement was to raise his Criminal History Category from V to VI, which raised his guidelines range from 188–235 months to 210–262 months.[10] (PSI ¶ 44.) Either way, Williams would have received the same 235-month sentence.

### 15. Claims 11 and 21: Transcripts

In **claim 11** and **claim 21**, Williams alleges that the trial transcripts contained errors and that his attorneys were ineffective in failing to challenge these errors. [DE-1 at 14, 18; DE-5 at 16–18, 33–39.] The standard for claims of an erroneous or incomplete trial record is whether the gaps or errors in the record were significant enough to preclude meaningful appellate review of potentially reversible error. *See United States v. Gil*, 581 F. App'x 766, 770 (11th Cir. 2014) (citing *United States v. Preciado-Cordobas*, 981 F.2d 1206, 1213–14 (11th Cir. 1993)), *cert. denied sub nom., Jorge v. United States*, 14-9372, 2015 WL 1779324 (May 18, 2015). This requires either a "substantial and significant omission from the trial transcript" or a showing that "the failure to record and preserve a specific portion of the trial visits a hardship on him and prejudices his appeal." *Preciado-Cordobas*, 981 F.2d at 1212.

This standard is not met here. First, there is no "substantial and significant omission" but only a small number of minor alleged omissions, mostly in Williams's own testimony. Second, Williams fails to show how any of the particular alleged omissions could have prejudiced his appeal. None have any obvious relevance to the

---

[10]    His base offense level was 28. Four points were added for the use of a dangerous weapon and obstruction of justice, resulting in a total offense level of 32. Because the statutory maximum was 20 years, a career-offender enhancement would not have changed his total offense level. *See* U.S.S.G. 4B1.1(b)(3).

grounds raised on appeal or suggest any independent grounds for appeal. Because none of the alleged errors prejudiced Williams's appeal, his attorneys were not deficient for failing to raise them.

### 16. Claims 23 and 26: Judicial and Juror Bias

In **claim 23**, Williams alleges judicial bias on the basis of several rulings, such as admitting the cellular phone records into evidence. [DE-1 at 19; DE-5 at 41–52.] Magistrate Judge White rejected this claim, noting that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States*, 510 U.S. 540, 555 (1994). As Williams's objections make clear, his claim is based solely on particular rulings with which Williams disagrees. [DE-51 at 74–76.] Because Williams fails to state a claim for judicial bias, these objections are overruled.

In **claim 26**, Williams alleges that a juror failed to disclose material information during *voir dire* and was therefore biased. "To justify a post-trial hearing involving the trial's jurors, the defendant must do more than speculate; he must show clear, strong, substantial and incontrovertible evidence . . . that a specific, nonspeculative impropriety has occurred." *United States v. Cuthel*, 903 F.2d 1381, 1383 (11th Cir. 1990) (quotation and citation omitted). For a claim alleging juror misconduct during *voir dire*, "a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip. Inc. v. Greenwood*, 464 U.S. 548, 556 (1984).

Here, Williams can point neither to any specific impropriety nor to any material question that was answered dishonestly. The juror admitted on her questionnaire that her son was an attorney and stated during *voir dire* that this would not affect her ability to sit as an impartial juror. [DE-4 at 95; Cr-DE-171 at 128.] Williams speculates that the juror was really the mother of Scott Rothstein, who allegedly told an inmate at FDC that

he and his mother knew the trial judge overseeing Williams's case. [DE-4 at 84.]
Williams also speculates that the juror may have known one of the prosecutors because
one of Scott Rothstein's law partners had the same last name as the prosecutor. [DE-24.]
None of this suggests impropriety or misconduct. Therefore, this claim is meritless.

## C. CONCLUSION

Because Williams cannot show "that jurists of reason could disagree with the
district court's resolution of his constitutional claims or that jurists could conclude the
issues presented here are adequate to deserve encouragement to proceed further," *Jones
v. Sec'y, Dep't of Corr.*, 607 F.3d 1346, 1349 (11th Cir. 2010), a certificate of appealability is
not warranted. *See* 28 U.S.C. § 2253(c)(2). Accordingly, it is hereby

ORDERED that

1)      The Report of Magistrate Judge Following Evidentiary Hearing [DE-48] is
ADOPTED IN PART as to the specific portions explicitly referenced in the text of this
Order.

2)      The Report of Magistrate Judge Following Evidentiary Hearing [DE-48] is
AFFIRMED.

3)      The instant petition is DISMISSED WITH PREJUDICE.

4)      A certificate of appealability is DENIED.

5)      This case is CLOSED.

6)      Any motions not otherwise ruled upon are DENIED AS MOOT.

DONE AND ORDERED in Miami, Florida, this ___7___ day of July, 2015.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE